UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK MENDON, individually and for his individual account damages on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, et al., <br><br><br> Plaintiffs, <br><br><br> v. <br><br> SS&C TECHNOLOGIES HOLDINGS, INC., DST SYSTEMS, INC., THE ADVISORY COMMITTEE OF THE DST SYSTEMS, INC., 401(K) PROFIT SHARING PLAN, THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF DST SYSTEMS, INC., RUANE, CUNNIFF & GOLDFARB, INC., and John Does 1-20, <br><br> Defendants. | Case No. 18-CV-10252 (ALC) |

**MEMORANDUM OF LAW IN SUPPORT OF
THE DST DEFENDANTS' MOTION TO DISQUALIFY CONFLICTED COUNSEL**

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

I.      Plaintiffs' Counsel Accuse Their Own Clients of Wrongdoing ......................................... 4

II.     Plaintiffs' Counsel's Actions Confirm the Conflict............................................................ 9

ARGUMENT ...................................................................................................................... 10

I.      The Court Should Disqualify Plaintiffs' Counsel in These Actions and the
Arbitrations ..................................................................................................................... 10

       A.     Plaintiffs' Counsel's Concurrent Conflicts of Interest Warrant
Disqualification.................................................................................................... 11

       B.     Plaintiffs Are Not Prejudiced By Disqualification .............................................. 14

       C.     The Court Should Disqualify Plaintiffs' Counsel From Their Conflicted
Representation of Any Plan Participant ............................................................... 16

CONCLUSION.................................................................................................................... 17

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Akagi* v. *Turin Hous. Dev. Fund Co.*,
  No. 13-cv-5258, 2017 WL 1076345 (S.D.N.Y. Mar. 22, 2017) ............................................. 10

*Anderson* v. *Nassau Cty. Dep't of Corr.*,
  376 F. Supp. 2d 294 (S.D.N.Y. 2005) ....................................................................................... 14

*Blue Planet Software, Inc.* v. *Games Int'l, LLC*,
  331 F. Supp. 2d 273 (S.D.N.Y. 2004) ....................................................................................... 10

*Cinema 5, Ltd.* v. *Cinerama, Inc.*,
  528 F.2d 1384 (2d Cir. 1976) ........................................................................................... 3, 10, 11

*Coan* v. *Kaufman*,
  457 F.3d 250 (2d Cir. 2006) ....................................................................................................... 17

*Cohen* v. *Strouch*,
  No. 10–cv-7828, 2011 WL 1143067 (S.D.N.Y. Mar. 24, 2011) ............................................. 11

*Ferguson* v. *Ruane Cuniff & Goldfarb Inc.*,
  No. 17-cv-06685, 2019 WL 1434435 (S.D.N.Y. Mar. 29, 2019) ............................................ 15

*First NBC Bank* v. *Murex, LLC*,
  259 F. Supp. 3d 38 (S.D.N.Y. 2017) .................................................................................... 10, 11

*GSI Commerce Sols., Inc.* v. *BabyCenter, L.L.C.*,
  618 F.3d 204 (2d Cir. 2010) .................................................................................................. 3, 10

*Hull* v. *Celanese Corp.*,
  513 F.2d 568 (2d Cir. 1975) ....................................................................................................... 10

*JPMorgan Chase Bank ex rel. Mahonia Ltd. & Mahonia Nat. Gas* v. *Liberty Mut. Ins. Co.*,
  189 F. Supp. 2d 20 (S.D.N.Y. 2002) ......................................................................................... 15

*Nw. Nat'l Ins. Co.* v. *Insco, Ltd.*,
  No. 11-cv-1124, 2011 WL 4552997 (S.D.N.Y. Oct. 3, 2011) ............................................ 16, 17

*Red Ball Interior Demolition Corp.* v. *Palmadessa*,
  908 F. Supp. 1226 (S.D.N.Y. 1995) ........................................................................................... 10

*In re Snyder*,
  472 U.S. 634 (1985) .................................................................................................................... 10

*Travelers Indem. Co.* v. *Gerling Global Reinsurance Corp.*,
    No. 99-cv-4413, 2000 WL 1159260 (S.D.N.Y. Aug. 15, 2000)........................................12, 14

*Troika Media Grp., Inc.* v. *Stephenson*,
    No. 19-cv-145, 2019 WL 5587009 (S.D.N.Y. Oct. 30, 2019).................................................16

**OTHER AUTHORITIES**

N.Y. R. Prof'l Conduct 1.7 ....................................................................................................10, 14

## PRELIMINARY STATEMENT

Plaintiffs' counsel face a serious and direct conflict:  they concurrently represent approximately 420 participants in the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Plan") together with three Plan fiduciaries whom they allege in these and other actions committed a series of ERISA violations that caused losses to the Plan accounts of their other clients.  In other words, Plaintiffs' counsel represent three individuals that they accuse of wrongdoing at the same time as they represent the supposed victims of that very alleged wrongdoing.  This is a fundamental conflict of interest that taints these proceedings and prejudices their clients.  Neither the law nor ethical rules permit Plaintiffs' counsel to represent at the same time the adverse interests between, on the one hand, non-fiduciary Plan participants and, on the other, the interests of the Plan fiduciaries whose decisions Plaintiffs' counsel allege violated ERISA.

The allegations in these actions make plain that Plaintiffs' counsel are pursuing claims that are directly adverse to the interests of their own clients.  Plaintiffs' counsel represent three former members of the DST Advisory Committee:  Kenneth Hager, Tom McDonnell, and Joan Horan.  The Advisory Committee was the named fiduciary of the Plan and, accordingly, its members owed fiduciary duties to Plan participants, including Plaintiffs' counsel's other clients, to oversee the Plan in the best interests of the participants.

Yet Plaintiffs' counsel purport to ***sue their own clients*** in these cases.  The very first paragraph of the Complaints reveals that "***Plaintiffs . . . bring this action . . . against . . . the individual members of The Advisory Committee . . . .*"  (*Canfield* Compl. ¶ 1; *Mendon* Compl. ¶ 1 (emphasis added).)  The Complaints go on to allege a series of supposed wrongful actions committed by Plaintiffs' counsel's clients who acted as Plan fiduciaries.  All of this alleged conduct occurred during the period between 2010 and 2013 when Plaintiffs' counsel's clients served on the Advisory Committee:

- The Hiring and Retention of Ruane. The Complaints allege that the DST fiduciaries violated ERISA by "select[ing] and retain[ing]" Ruane, Cunniff & Goldfarb ("Ruane") as an investment manager for the Plan. (*Canfield* Compl. ¶ 45; *Mendon* Compl. ¶ 42.) The DST fiduciaries allegedly ignored an "obvious conflict of interest" in selecting and retaining Ruane as investment manager. (*Canfield* Compl. ¶ 43; *Mendon* Compl. ¶ 40.) Yet Ruane was the Plan's investment manager since 1973—and throughout the period during which Plaintiffs' counsel's clients served on the Advisory Committee. Indeed, one of Plaintiffs' counsel's clients, Kenneth Hager, ***signed the investment management agreements*** between Ruane and the Plan. (Declaration of Jeffrey J. Recher dated Feb. 18, 2020 ("Recher Decl.") Exs. A, B.)

- The Fees Charged by Ruane. The Complaints allege that the annual fee charged by Ruane was "grossly and objectively excessive and exceeds that which, if acting without self-interest . . . Defendants could have negotiated." (*Canfield* Compl. ¶ 46; *Mendon* Compl. ¶ 43.) Plaintiffs allege that a "prudent fiduciary" would have "negotiated an annual fee of far less than one percent" and, by allegedly failing to do so, the Advisory Committee "breached the fiduciary duties owed to the Plan." (*Id.*) Ruane charged the same one-percent fee throughout the period when Plaintiffs' counsel's clients were Plan fiduciaries.

- Ruane's Investment Strategy. Plaintiffs allege that the investment strategy pursued by Ruane was inappropriate for an ERISA-governed retirement plan. The Complaints allege, for example, that Ruane's investment strategy—which it pursued for the Plan as well as other investment vehicles it managed like the Sequoia Fund—failed to adhere to ERISA's "investment objectives and suitability standards." (*Canfield* Compl. ¶ 44; *Mendon* Compl. ¶ 41.)

- The Valeant Investment. Plaintiffs also contend that a 2010 investment in Valeant Pharmaceuticals stock made by Ruane on behalf of the Plan was inherently unsuitable. The Complaints allege, for example, that Valeant "pursued a particularly risky and potentially dubious growth strategy, which clearly did not meet the Plan's purported investing criteria or the criteria of an objectively prudent fiduciary." (*Canfield* Compl. ¶ 37; *Mendon* Compl. ¶ 34.) This supposedly inappropriate business strategy was allegedly in place at Valeant "***since at least 2008***." (*Canfield* Compl. ¶ 34; *Mendon* Compl. ¶ 31 (emphasis added).) The Complaints further allege that "Defendants ***knew or should have known by at least 2011*** that Valeant was a particularly risky and imprudent investment." (*Canfield* Compl. ¶ 39; *Mendon* Compl. ¶ 36 (emphasis added).)

Plaintiffs thus accuse their own clients of multiple ERISA violations in connection with their Plan oversight responsibilities as members of the Advisory Committee while also representing hundreds of Plan participants supposedly harmed by that alleged conduct. The Second Circuit has squarely held that the concurrent representation of clients with

adverse interests is "**prima facie improper**." *Cinema 5, Ltd.* v. *Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976) (emphasis added).  Disqualification in those circumstances is required "because an attorney must avoid not only the fact, **but even the appearance of representing conflicting interests**." *Id.*  In fact, the Second Circuit has recognized that an effort by a conflicted attorney to avoid disqualification in these circumstances is "a burden so heavy that it will rarely be met." *GSI Commerce Sols., Inc.* v. *BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010) (citation omitted).

Plaintiffs' counsel's attempt to avoid disqualification only serves to highlight their intractable conflict of interest.  Plaintiffs' counsel now assert that their claims are supposedly limited to "breaches occurring in or after 2014"—*i.e.*, three months after the last of their three clients ended their service on the Advisory Committee.  (*Canfield*, ECF No. 26 at 1; *Mendon*, ECF No. 28 at 1.)  The Complaints, of course, squarely allege misconduct that began and continued prior to 2014—whether the selection and retention of Ruane, supposedly excessive fees, the investment strategy employed by Ruane, or the Valeant investment itself—during the time when Plaintiffs' counsel's clients were Plan fiduciaries.  Plaintiffs' counsel's contention that they merely challenge post-2014 conduct is thus demonstrably false.

Moreover, far from justifying their conflict, Plaintiffs' counsel's transparent effort to time-limit their claims highlights the disqualifying nature of their conflict:  if they abandon the pre-2014 allegations in their Complaint, they are sacrificing the claims brought by certain of their clients in an effort to mitigate the impression that they are directly attacking the three former Plan fiduciaries that they also represent.  Sacrificing the apparent interests of one group of clients to favor another proves even more than the mere "appearance of representing conflicting interests" that the Second Circuit has held warrants disqualification.

3

What's more, Plaintiffs' counsel's clients will suffer no prejudice from barring Plaintiffs' counsel from continuing in their conflicted representation.  There already are two representative actions before this Court featuring substantially similar allegations against the same defendants which seek to recover on behalf of *all* Plan participants, including the individuals represented by Plaintiffs' counsel here.  *See Ferguson* v. *Ruane, Cuniff & Goldfarb Inc.*, No. 17-cv-06685 (ALC) (S.D.N.Y. 2017); *Scalia* v. *Ruane, Cunniff & Goldfarb, Inc.*, No. 19-cv-09302 (ALC) (S.D.N.Y. 2019).  The lawyers in those cases—Department of Labor attorneys and private lawyers representing the Plan as a whole—do not suffer from the conflicts of interest that infect Plaintiffs' counsel's representation.  While the DST Defendants believe that the claims asserted in all the actions are without merit, the only individuals who have a real interest in avoiding disqualification are Plaintiffs' counsel themselves—who seek to extract unnecessary and unmerited fees from clients whose interests already are being represented in other actions.

## FACTUAL BACKGROUND

### I.    Plaintiffs' Counsel Accuse Their Own Clients of Wrongdoing

Plaintiffs in these actions are current or former employees of DST who were participants in the DST Plan.  They are represented by four law firms:  The Klamann Law Firm; Kapke & Willerth; White, Graham, Buckley & Carr; and Humphrey, Farrington & McClain.[1] Each of those same four law firms concurrently represent approximately 420 other Plan participants who have asserted the same claims in AAA arbitration against the same defendants using nearly identical language as that in the Complaints here.  (*See, e.g.*, Recher Decl. Ex. C.)

---

[1]    Plaintiffs in these actions also are represented by New York-based local counsel, Kent, Beatty & Gordon, LLP.  To our knowledge, Kent, Beatty & Gordon, LLP does not represent the former Plan fiduciaries or any Plan participant clients in matters other than these actions.  That firm accordingly is not the subject of this motion.

Among the approximately 420 arbitration claimants that Plaintiffs' counsel represent are three former members of the DST Advisory Committee.

The Advisory Committee was the named fiduciary of the Plan.  It was responsible for the management and administration of the Plan, including exercising "fiduciary duties with respect to the Plans and the Plans' trusts, and monitor[ing] the conduct and performance of the fiduciaries of the Plans and The Plans' trusts."  (*See* Recher Decl. Ex. D, at -112.)  Each of Plaintiffs' counsel's three clients were long-time members of the Advisory Committee and spent decades as Plan fiduciaries.  Mr. McDonnell, DST's former Chief Executive Officer, served on the Advisory Committee from December 27, 1984 until September 13, 2012.  Mr. Hager, DST's former Vice President and Chief Financial Officer, served on the Advisory Committee from May 25, 1988 until October 21, 2013.  Ms. Horan, DST's former Vice President of Human Resources, served on the Advisory Committee from November 18, 1985 until December 6, 2010.  Plaintiffs' counsel's clients thus collectively spent more than 78 years overseeing the Plan that forms the subject of these litigations.

In these cases, Plaintiffs—seven individual Plan participants—allege a series of ERISA violations against DST Systems, Inc., the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan and the Compensation Committee of the Board of Directors of DST Systems, Inc. (the "DST Defendants") and Ruane, the investment manager retained by the DST Defendants to manage the relevant portion of the Plan.  In fact, Plaintiffs purport to sue the "individual members of The Advisory Committee"—three of whom Plaintiffs' counsel represent. (*Canfield* Compl. ¶ 1; *Mendon* Compl. ¶ 1; Recher Decl. Ex. C ¶ 1.)

Plaintiffs allege a series of supposed ERISA violations that squarely implicate their own clients in supposed wrongdoing.  *First*, they contend that the DST Defendants violated

ERISA by "select[ing] and retain[ing]" Ruane to manage a portion of the Plan's assets—a decision that was allegedly made by the Plan fiduciaries as a result of DST's "selfish interest" in retaining Ruane, to which DST allegedly provided services.  (*Canfield* Compl. ¶ 45; *Mendon* Compl. ¶ 42; Recher Decl. Ex. C ¶ 39.)  *Second*, Plaintiffs allege that the investment management fee paid to Ruane was at all times "grossly and objectively excessive" and violated ERISA.  (*Canfield* Compl. ¶ 46; *Mendon* Compl. ¶ 43; Recher Decl. Ex. C ¶ 40.)  *Third*, Plaintiffs assert that the overall investment strategy employed by Ruane failed to adhere to the "investment objectives and suitability standards" of ERISA.  (*Canfield* Compl. ¶ 44; *Mendon* Compl. ¶ 41.)  Contrary to Plaintiffs' counsel's recent assertion that their allegations only challenge conduct in or after 2014, each of these claims directly attack conduct that occurred and was continuing prior to 2014—and thus squarely allege that Plaintiffs' counsel's own clients violated ERISA.

Ruane had managed Plan assets since 1973 and Plaintiffs' counsel's Advisory Committee clients had thus permitted Ruane to serve as investment manager despite DST's so-called "selfish interest," despite its allegedly inappropriate investment strategy, and despite the one-percent annual management fee that Plaintiffs' counsel contend was "grossly excessive." In fact, one of Plaintiffs' counsel's clients, Kenneth Hager, signed investment management agreements with Ruane in 1998 and again in 2010.  (Recher Decl. Exs. A, B.)

Plaintiffs' allegations that a Plan investment in Valeant stock violated ERISA likewise fault their own clients.  Plaintiffs allege that Valeant "pursued an aggressive growth-by-acquisition model *since at least 2008*" (*Canfield* Compl. ¶ 34; *Mendon* Compl. ¶ 31; Recher Decl. Ex. C ¶ 29 (emphasis added)) that constituted a "particularly risky and potentially dubious growth strategy, which clearly did not meet the Plan's purported investing criteria or the criteria

of an objectively prudent fiduciary." (*Canfield* Compl. ¶ 37; *Mendon* Compl. ¶ 34; Recher Decl. Ex. C ¶ 32.)  The Complaints also allege that the DST Defendants "knew or should have known **by at least 2011** that Valeant was a particularly risky and imprudent investment." (*Canfield* Compl. ¶ 39; *Mendon* Compl. ¶ 36; Recher Decl. Ex. C ¶ 34 (emphasis added).)  Yet, each of Plaintiffs' counsel's three clients served on the Advisory Committee when the Valeant investment was purchased for the Plan in 2010, despite the "particularly risky . . . growth strategy" that the Complaints allege had rendered Valeant an imprudent investment by 2008. (*Canfield* Compl. ¶ 34; *Mendon* Compl. ¶ 31; Recher Decl. Ex. C ¶ 29.)  Both Mr. Hager and Mr. McDonnell also served on the Advisory Committee in 2011, when the Complaints allege that they knew or should have known that the Valeant stock in the Plan was "particularly risky and imprudent." (*Canfield* Compl. ¶ 39; *Mendon* Compl. ¶ 36; Recher Decl. Ex. C ¶ 34.)

At the January 21 pre-motion conference, Plaintiffs' counsel claimed that the allegation in their Complaints that the Plan fiduciaries knew or should have known "by at least 2011" that the Valeant investment was imprudent was a mere "typo." (*See* Recher Decl. Ex. E, at 7:17-18.)  It is difficult to credit that claim because Plaintiffs' counsel made the identical supposed "typo" in two separate complaints before this Court and literally hundreds of arbitration demands. (*Canfield* Compl. ¶ 39; *Mendon* Compl. ¶ 36; Recher Decl. Ex. C ¶ 34; Recher Decl. Ex. F ¶ 34.)  Moreover, although the DST Defendants specifically identified that allegation in two separate letters before the conference, not once did Plaintiffs' counsel assert that the 2011 date was a supposed "typo"—nothing was said about a "typo" in the letter sent by Plaintiffs' counsel to the DST Defendants or in their letter to the Court. (*Canfield*, ECF Nos. 25, at Ex. B, 26; *Mendon*, ECF Nos. 27, at Ex. B, 28.)  Indeed, Plaintiffs' counsel's supposed "typo" is not the only place where they allege that the Valeant investment was inappropriate for the Plan

*before* 2014.  The Complaints elsewhere allege that Valeant had pursued a business model inherently unsuited for an ERISA investment starting even earlier—by 2008.  (*See Canfield* Compl. ¶ 34; *Mendon* Compl. ¶ 31; Recher Decl. Ex. C ¶ 29.)  Beyond that, in the weeks following the pre-motion conference at which Plaintiffs' counsel disclosed the supposed typo, Plaintiffs' counsel served four additional arbitration demands on DST.  Each of them contained the same supposed "typo" and alleged that the DST fiduciaries knew or should have known that Valeant was a supposedly imprudent investment "by at least 2011."  (*See* Recher Decl. Ex. F.)

The lawsuit filed in this Court by the Department of Labor also highlights Plaintiffs' counsel's conflicts.  In that case, the Department of Labor contends that the DST Defendants and Ruane violated ERISA by supposedly pursuing an inappropriate investment strategy (including the Valeant investment).  The Department of Labor named Kenneth Hager— one of Plaintiffs' counsel's clients—as an individual defendant in that action.  Complaint, *Scalia* v. *Ruane*, *Cunniff & Goldfarb, Inc.*, No. 19-cv-09302 (ALC) (S.D.N.Y. Oct. 8, 2019).  The DST Defendants' counsel does not represent Mr. Hager in the *Scalia* action, who is separately represented in that case.  Nor do the DST Defendants' counsel represent any individual defendant who is asserting claims against the Plan fiduciaries.

Plaintiffs' counsel, however, are in a legally and ethically untenable position.  Not only are they actively pressing allegations in these and other cases that risk subjecting their own clients to liability, like Mr. Hager, Mr. McDonnell, and Ms. Horan, they cannot avoid imperiling those clients unless they avoid pressing arguments or allegations advantageous to their ***other*** clients—who did not act as fiduciaries for the Plan or have responsibility for the decisions that Plaintiffs contend violate ERISA.  As their conduct in this case already has demonstrated, that is precisely what Plaintiffs' counsel have chosen to do.

## II.      Plaintiffs' Counsel's Actions Confirm the Conflict

The DST Defendants brought these significant conflicts of interest to the attention of Plaintiffs' counsel on October 31, 2019.  (*Canfield*, ECF No. 25, at Ex. A; *Mendon*, ECF No. 27, at Ex. A.)  Plaintiffs' counsel declined to offer any explanation as to how they could concurrently represent clients with adverse interests.  (*Canfield*, ECF No. 25, at Ex. B; *Mendon*, ECF No. 27, at Ex. B.)  Despite repeated requests, Plaintiffs' counsel also refused to disclose whether their clients were even aware of their conflicted representation.  (*See id.*)  The DST Defendants were thus compelled to obtain leave to file this motion.  (*Canfield*, ECF Nos. 25, 27; *Mendon*, ECF Nos. 27, 29.)

In opposing leave, Plaintiffs' counsel asserted—for the first time—that their claims sought only to "establish[] the liability of DST and Ruane for breaches occurring in or after 2014."  (*Canfield*, ECF No. 26, at 1; *Mendon*, ECF No. 28, at 1.)  But that is untrue, as shown by the clear language of the Complaints.  As the comparison in Appendix A to this Memorandum of Law demonstrates, the assertions in Plaintiffs' counsel's letter to the Court about the scope of their claims are disproven by the allegations in the Complaints.  The only available conclusion is that Plaintiffs' counsel are mischaracterizing their own allegations in an effort to justify a conflicted representation.  Not only does that tactic fail to cure the problem, it demonstrates the conflict.  Plaintiffs' counsel propose to abandon allegations made on behalf of their clients in this case to serve the interests of *other, differently situated clients,* all to further their own interests as counsel.  It is fundamental that lawyers—who are fiduciaries for their clients—cannot act in that way.

**ARGUMENT**

I.     **The Court Should Disqualify Plaintiffs' Counsel in These Actions and the Arbitrations**

In the case of concurrent representation, the Second Circuit clearly has held that it is the burden of the attorney opposing disqualification to "show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution of the vigor of his representation." *Cinema 5 Ltd.*, 528 F.2d at 1387. That is because the concurrent representation of clients with adverse interests is "prima facie improper." *Id.* Indeed, "an attorney must avoid not only the fact, but ***even the appearance***, of representing conflicting interests." *Id.* (emphasis added) (citation omitted). This burden is "so heavy that it will rarely be met." *GSI Commerce Solutions, Inc.*, 618 F.3d at 209 (citation omitted); *see Akagi* v. *Turin Hous. Dev. Fund Co.*, No. 13-cv-5258, 2017 WL 1076345, at *12 (S.D.N.Y. Mar. 22, 2017). "[A]ny doubt is to be resolved in favor of disqualification." *Hull* v. *Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *see also First NBC Bank* v. *Murex, LLC*, 259 F. Supp. 3d 38, 56 (S.D.N.Y. 2017); *Blue Planet Software, Inc.* v. *Games Int'l, LLC*, 331 F. Supp. 2d 273, 275 (S.D.N.Y. 2004); N.Y. R. Prof'l Conduct 1.7(a) ("[A] lawyer shall not represent a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests . . .").

Federal courts have the "inherent power to preserve the integrity of the adversary process," *First NBC Bank*, 259 F. Supp. 3d at 55, and that includes regulating the conduct of lawyers who appear before them. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985); *see also Red Ball Interior Demolition Corp.* v. *Palmadessa*, 908 F. Supp. 1226, 1245 (S.D.N.Y. 1995) ("A trial judge has the inherent authority to regulate lawyers' professional conduct."). "The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *First NBC Bank*, 259 F. Supp. 3d at 55 (citation omitted).

10

Plaintiffs' counsel's concurrent representation of clients with adverse interests not only gives rise to the appearance of impropriety, it *already* has affected their representation. Second Circuit precedent thus squarely requires disqualification, especially here, where this Court already has found that the interests of Plaintiffs' counsel's clients are adequately represented by unconflicted lawyers in other actions before this Court that seek to recover on behalf of all Plan participants.  Plaintiffs' counsel should be precluded from continuing in their representation of any Plan participant.

### A.     Plaintiffs' Counsel's Concurrent Conflicts of Interest Warrant Disqualification

Plaintiffs' counsel can come nowhere close to satisfying their burden under controlling law to demonstrate that their concurrent representation of clients with adverse interests could have no "actual or apparent" effect on their representation.  *Cinema 5 Ltd.*, 528 F.2d at 1387.  There is no dispute that Plaintiffs' counsel concurrently represent both Plan fiduciaries as well as Plan participants who they allege were wronged by the fiduciaries who oversaw the Plan.  It is difficult to imagine a more directly adverse representation.  *See Cohen* v. *Strouch*, No. 10–cv-7828, 2011 WL 1143067, at *4 (S.D.N.Y. Mar. 24, 2011) ("Where, as here, an attorney or firm takes on multiple representations that will require advocating a position for one client that would directly adversely affect another client's interest, there is an 'imminent threat of a serious conflict,' making disqualification appropriate from the start of the proceedings." (quoting *Dunton* v. *Suffolk Cty., State of N.Y.*, 729 F.2d 903, 907 (2d Cir.), *amended by* 748 F.2d 69 (2d Cir. 1984))).

Nor can Plaintiffs' counsel somehow parse their allegations or litigation strategy to avoid impugning their Plan-fiduciary clients consistent with the undivided loyalty they owe to their *other* clients.  How could Plaintiffs' counsel offer unconflicted advice to their clients about

11

which arguments to press or claims to pursue knowing all the while that they cannot ethically assert any arguments or claims that might call into question the conduct of their Plan-fiduciary clients?  How can Plaintiffs' counsel conduct depositions or examine witnesses with the knowledge that they cannot ethically seek to elicit information about the conduct of their Plan-fiduciary clients?  What ethical use can Plaintiffs' counsel make of discovery concerning the time period after their clients served as Plan fiduciaries but that might call into question similar, earlier conduct by their own clients?  No reasonable client or observer could assure themselves that Plaintiffs' counsel's decisions in litigating these cases were uninfluenced by their obligations not to imperil their differently situated, Plan-fiduciary clients.  This is precisely the sort of fundamental, intractable conflict that warrants disqualification.  The ethical obligations and governing Second Circuit law concern themselves only with the *appearance* of a conflict.  Put differently, "it is the ***mere risk of divided loyalty*** that the Court is concerned with, not only ethical scenarios that can be readily envisioned at this juncture."  *Travelers Indem. Co.* v. *Gerling Global Reinsurance Corp.*, No. 99-cv-4413, 2000 WL 1159260, at *6 (S.D.N.Y. Aug. 15, 2000) (emphasis added).

Plaintiffs' counsel's conduct in this case already has amply demonstrated their conflicted loyalties.  After being confronted with their conflict of interest, Plaintiffs' counsel have now taken the position that they allege only "breaches occurring in or after 2014." (*Canfield*, ECF No. 26, at 1; *Mendon*, ECF No. 28, at 1.)  That is, Plaintiffs' counsel attempt to rescue their conflicted representation by apparently forfeiting challenges to conduct that occurred while their Plan-fiduciary clients served on the Advisory Committee.  But Plaintiffs' counsel's position in fact *underscores* their conflict of interest.

Plaintiffs' complaints clearly challenge pre-2014 conduct, including the conduct of their own clients.  The Complaints allege ERISA violations from at least four distinct events all of which occurred or were continuing before 2014 when Plaintiffs' counsel's clients served on the Advisory Committee:  the selection and retention of Ruane as the Plan's investment manager, the fees charged by Ruane, the investment strategy employed by Ruane, and the Plan investment in Valeant.  *See supra* at 5–7.  In fact, Plaintiffs' counsel's attempt to disclaim the allegations that they made in these cases shows not merely the appearance of a conflict, but actual conflicted loyalties at work.  Insofar as Plaintiffs' counsel now seek *not* to pursue the pre-2014 allegations that they actually pled, the only reasonable conclusion to be drawn is that Plaintiffs' counsel seek to abandon those allegations *because* they cannot maintain them consistent with their ethical obligations to their Plan-fiduciary clients.

Plaintiffs' counsel cannot satisfy their obligations to both sets of clients.  At a minimum, Plaintiffs' counsel cannot avoid the appearance that whatever tactical choices they make—including the time as of when they purport to assert breaches of ERISA—are influenced by the fact that they are representing clients who served as Plan fiduciaries.  And those choices have real consequences for Plaintiffs' counsel's clients.  Plaintiffs' counsel represent, for example, multiple clients who withdrew all or a significant portion of their assets from the relevant portion of the Plan between 2010 and 2014—the period for which Plaintiffs' counsel now assert they are not pressing the allegations in their Complaints.  Thus, Plaintiffs' counsel would apparently extinguish or diminish the claims of their other clients in the hopes of salvaging their representation of their Plan-fiduciary clients.

The improper influence that the representation of clients with adverse interests may exert on a lawyer's advice and litigation strategy is precisely the reason that Second Circuit

courts consider disqualification essentially mandatory in these circumstances. As one court recognized, disqualification in the case of concurrent conflicts serves to "protect a client not only from outright and egregious examples of divided loyalty, but also the subtle and indefinable impact that it might have on an attorney's representation." *Travelers Indem. Co.*, 2000 WL 1159260, at *6. The ethical rules are in accord. New York Rule of Professional Conduct 1.7, for example, prohibits a representation "if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests." N.Y. R. Prof'l Conduct 1.7(a). Differing interests are those that, like here, present "a significant risk that a lawyer's exercise of professional judgment in considering, recommending or carrying out an appropriate course of action for the client will be adversely affected or the representation would otherwise be materially limited by the lawyer's other responsibilities or interests." *Id.* cmt. 8.

Plaintiffs' counsel therefore cannot meet their burden to show that there is not so much as an appearance that they are representing clients with differing interests. Disqualification is warranted. Indeed, Plaintiffs' counsel's conflict is not even capable of cure by client consent. *See, e.g.*, *Anderson* v. *Nassau Cty. Dep't of Corr.*, 376 F. Supp. 2d 294, 299–300 (S.D.N.Y. 2005) ("[C]onsent must have been obtained prior to [an attorney] undertaking representation of adverse interests, not in response to a motion to disqualify.").

## B.   Plaintiffs Are Not Prejudiced By Disqualification

Second Circuit precedent clearly dictates that Plaintiffs' counsel's concurrent representation of clients with adverse interests requires disqualification. Indeed, disqualification is particularly appropriate here because Plaintiffs' counsel's clients will suffer no prejudice. These cases are entirely redundant of other, pending actions before this Court which, as here, seek to recover alleged losses to the Plan based on substantially similar allegations. *See Ferguson* v. *Ruane, Cuniff & Goldfarb Inc.*, No. 17-cv-06685 (ALC) (S.D.N.Y. 2017); *Scalia* v.

14

*Ruane, Cunniff & Goldfarb, Inc.*, No. 19-cv-09302 (ALC) (S.D.N.Y. 2019).  Those cases seek to recover losses to the *entire* Plan on behalf of *all* Plan participants, and unlike Plaintiffs' counsel, the lawyers in those cases do not represent clients with opposing interests.  Nor have they attempted to modify their allegations to favor some clients to the detriment of others.

Indeed, as the Court already found when it denied Plaintiffs' counsel's motion to intervene in the *Ferguson* action, Plaintiffs' counsel's clients are adequately represented by the lawyers seeking Plan-wide relief in *Ferguson.  See Ferguson* v. *Ruane Cuniff & Goldfarb Inc.*, No. 17-cv-06685, 2019 WL 1434435, at *4–5 (S.D.N.Y. Mar. 29, 2019).  Moreover, since that time, the Department of Labor has filed its own complaint that likewise seeks Plan-wide relief. The only individuals with any interest in avoiding disqualification therefore are not Plaintiffs' counsel's clients—whose claims would in any event be prosecuted by lawyers *without* significant conflicts—but instead Plaintiffs' counsel themselves, who would be deprived of the opportunity to impose additional fees for prosecuting the same claims that were first brought in this Court by other lawyers.

Nor is there any prejudice from disqualification at this stage of the proceedings. In these cases, the DST Defendants have not yet even briefed a motion to dismiss.  Discovery has not commenced.  In the arbitrations brought by Plaintiffs' counsel, the vast majority have yet to be scheduled and, for those arbitrations in which a hearing date has been scheduled, discovery is in the early stages.  As courts have recognized, raising disqualification "near the very outset of" litigation undermines any inference of tactical use, and insures that "the prejudice to plaintiff" is "relatively modest."  *See JPMorgan Chase Bank ex rel. Mahonia Ltd. & Mahonia Nat. Gas* v. *Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 20, 23 (S.D.N.Y. 2002).

15

**C.      The Court Should Disqualify Plaintiffs' Counsel From Their Conflicted Representation of Any Plan Participant**

The Court should enter an order disqualifying Plaintiffs' counsel and prohibiting them from continuing in their conflicted representation of *any* Plan participant.  Despite having appeared in this Court and submitted to its jurisdiction, Plaintiffs' counsel insist that the Court lacks the "authority" over them to issue an order that would prevent Plaintiffs' counsel from continuing their conflicted representation unabated in AAA arbitration, and that such an order would have "no force" and "no effect."  (*Canfield*, ECF No. 26, at 4; *Mendon*, ECF No. 28, at 4.) Put differently, Plaintiffs' counsel argues that, even if they are disqualified in these actions, the Court cannot put a stop to their unethical conduct in AAA arbitration.  Not only is Plaintiffs' counsel's position incorrect, the Second Circuit has recognized that the Court has a special duty to safeguard the interests of all Plan participants.  To permit Plaintiffs' counsel's conflicted representation to continue simply because certain Plan participants' claims are currently pending in arbitration would undermine the safeguards that the Second Circuit has been instructed should be employed by the courts to protect Plan participants' interests.

Contrary to Plaintiffs' counsel's assertion that the Court cannot issue an order that reaches their conduct in the arbitrations, courts routinely hold that they not only can, but must, address the disqualification and ethical conduct of lawyers in arbitration.  *See, e.g.*, *Troika Media Grp., Inc.* v. *Stephenson*, No. 19-cv-145, 2019 WL 5587009, at *4 (S.D.N.Y. Oct. 30, 2019) ("Attorney discipline has historically been a matter for judges and not arbitrators . . . ." (citation omitted)).  In fact, attorney disqualification is "a substantive matter for the courts and not arbitrators."  *Nw. Nat'l Ins. Co.* v. *Insco, Ltd.*, No. 11-cv-1124, 2011 WL 4552997, at *4 (S.D.N.Y. Oct. 3, 2011) (citation omitted).  The issue is "appropriately decided by the Court" because attorney disqualification is "not within the customary expertise of industry arbitrators."

*Id.* Plaintiffs' counsel thus should not be permitted to avoid the consequences of their conflicted representation—regardless of where they happen to be prosecuting some of the cases.

That conclusion applies with even more force here because, as the Second Circuit has recognized, this Court has special responsibilities under ERISA to protect all Plan participants. In *Coan*, the Second Circuit instructed that ERISA actions brought on behalf of retirement plans require "procedural safeguards" designed to "protect absent parties"—the specific nature of which Congress left "to be worked out by parties and judges according to the circumstances on a case by case basis." *Coan* v. *Kaufman*, 457 F.3d 250, 260 (2d Cir. 2006). There are, of course, multiple pending actions before the Court that seek relief in the name of the Plan and on a representative basis. While the Second Circuit declined to specify the specific safeguards that should be employed to protect the interests of all Plan participants, Plaintiffs' counsel cannot credibly contend that courts charged with oversight of representative ERISA actions lack the authority to disqualify attorneys engaged in conflicted representation of Plan participants.

**CONCLUSION**

For the foregoing reasons, the DST Defendants respectfully submit that their motion to disqualify Plaintiffs' Counsel should be granted.

17

Dated: February 18, 2020        Respectfully submitted,
       New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Lewis R. Clayton
    Lewis R. Clayton
    Jeffrey J. Recher
    Joshua D. Kaye

1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: lclayton@paulweiss.com

*Counsel for the DST Defendants*

**APPENDIX A**

| STATEMENT IN PLAINTIFFS' DECEMBER 9 LETTER [*CANFIELD*, ECF No. 26; *MENDON*, ECF No. 28.] | ACTUAL ALLEGATION IN THE COMPLAINT |
|---|---|
| "Each of counsels' clients allege that the failure to diversify the Plan's assets began either '*at the end of 2014*,' when the concentration in the stock of Valeant Pharmaceuticals first exceeded prudent concentration limits . . . *or on or about August 13, 2015* . . ." (Ltr. at 1.) | "Thus, ***Defendants knew or should have known by at least 2011*** that Valeant was a particularly risky and imprudent investment." (*Canfield* Compl. ¶ 39; *Mendon* Compl. ¶ 36.) |
| "For example, unlike the lawsuit filed by the DOL, ***plaintiffs in the above-referenced actions do not contend that . . . Ruane's original retention by DST was a breach of fiduciary duty.***" (Ltr. at 2.) | "Defendants selected and retained an investment manager, with whom they had a selfish interest, apart from the interests of the Plan participants. ***By retaining Defendant Ruane, Defendants failed to discharge their duty*** to select and retain an investment manager solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to Plan participants and beneficiaries." (*Canfield* Compl. ¶ 45; *Mendon* Compl. ¶ 42.)

"***In fact, with the authority, approval and consent of the Defendants***, which authority, approval and consent Defendants provided while acting as Plan fiduciaries, ***Ruane charged the DST Retirement Plan an annual fee of one percent (1%) of the assets in the Master Trust***. ***The fee is grossly and objectively excessive*** and exceeds that which, if acting without self-interest, with the requisite prudence and oversight, and in the sole interest of the Plan and its participant, Defendants could have negotiated." (*Canfield* Compl. ¶ 46; *Mendon* Compl. ¶ 43.) |
| "For example, unlike the lawsuit filed by the DOL, ***plaintiffs in the above-referenced actions do not contend that the overall investment strategy employed by Ruane violated ERISA*** . . . ." (Ltr. at 2.) | "Further, on information and belief, DST, as servicing agent for the Sequoia Fund, Inc. [managed by Ruane], was aware of the investment decisions, positions, and results of the Sequoia Fund and, ***although it knew or should have known that the investment objectives and suitability standards applicable to the Sequoia Fund were, and should have been, distinguishable from those owing to an ERISA retirement fund, sought, requested, ordered, and implemented a quasi-fund to match the investment strategies and decisions of the Sequoia***, ignoring that ERISA retirement plans do not share the same risk tolerance, investment objectives, and customer traits as a public fund." (*Canfield* Compl. ¶ 44; *Mendon* Compl. ¶ 41.) |
| "***Individual former committee members are unlikely to have either the authority necessary for the imposition of individual liability*** or the resources necessary to satisfy a judgment." (Ltr. at 3.) | "***Plaintiffs . . . bring this action . . . against . . . the individual members of The Advisory Committee*** of the DST Systems Inc., 401(k) Profit Sharing Plan at the time of the acts, errors and omissions alleged herein . . . ." (*Canfield* Compl. ¶ 1; *Mendon* Compl. ¶ 1.) |